## DANIEL PRATT GIN CO. v. TIMMERMAN.

CONTRACT—GINS.—Under the contract here it was the duty of the gin company to furnish a pulley that would run the machinery at 250 revolutions per minute, as the speed of the engine was given it before the pulley was shipped, and its failure to do so amounted to a failure on its part to perform its contract.

Before BUCHANAN, J., Aiken, April, 1901. Reversed.

Action by Mrs. Julia A. Pratt and others, doing business under firm name of Daniel Pratt Gin. Co., against J. E. & R. H. Timmerman. The Circuit decree is as follows:

"This case came on to be heard at Aiken, and was heard by the Court upon the pleadings, exhibits, evidence and a guaranty. The complaint alleges a sale of certain ginning and belt outfits to the defendants, which articles so sold and delivered to the defendants are specifically set out in an itemized list and are valued at the sum of $1,444. It was provided that payment should be made as follows: $722 were to become due on the first day of November, 1899, with interest from that day at eight per cent. ; $722 to become due on the 1st day of November, 1900, with interest if not so paid at the rate of eight per cent. from the 1st day of November, 1899. It was agreed that notes were to be made for said two instalments, that the amount due should be

considered a mortgage on the property for that amount, and a trust deed was to be executed. It was further agreed that the defendants would pay all damages that would be incurred by a failure of the contract on their part, and among other things a reasonable attorneys' fee for plaintiffs' attorneys was provided for. It further alleged that the defendants after receiving the property refused to comply with their contract; therefore, plaintiffs claim the relief set out in complaint.

"The answer sets up a general denial and a specific denial of each allegation not admitted. It admits there was a contract with the plaintiffs whereby the defendants were to pay the sum of $1,444, but says the machinery was (1) to be tested and to be proven satisfactory before they were to be called on to settle, and this has not been done. (2) That certain false statements as to the time of delivery were made, and that if the gins choked they would be given to the defendants, and, therefore, the contract should be rescinded. As a counter-claim, the defendants alleged they (1) were induced to build houses of the value of $600 upon their land to receive and use such machinery, to their damage $600. That the gins performed their work so unsatisfactorily that (2) the confidence of the people was shaken in the business capacity of these defendants, whereby they were injured in the sum of $500. That (3) by keeping the machinery and by furnishing screws and parts of the machinery, and having the same mended, they have been damaged $100. That (4) they have expended $100 for freight, etc. They were entitled to (5) clear profits of $600, and (6) for $400 for their services in trying to make the machinery work. It seems the contract was put in writing, and signed by or on behalf of the defendants. The principal cause of the defective working of the gin, it seems, was the defendants' action in attempting to run the machinery with a steam shaft making only 180 revolutions per minute, when the gins ordered were for steam shaft arranged to run the line shaft 250 revolutions per minute. As if to call special attention to this vital

requirement, there is further in the contract 'note' the following listed in catalogue are based on line shaft running 250 revolutions, but if there is any change in this speed, the pulleys which go on line shaft will have to be changed accordingly. Then there is some evidence that the machinery was not placed at the right angles to the shaft; or rather to the house; but this is a matter of such small moment and could have been seen so easily, that it need not be considered. Of course, the machinery worked badly—indeed, it would have been almost a miracle if it had worked smoothly under the condition. There was a breaking of a pin; possibly it was originally defective, of this, however, there was no evidence. Taking for granted that it was originally defective, this defect could be remedied under the terms of the contract by a demand on the plaintiff for a sound pin, or statement of the amount due to that extent (see warranty). The purchaser was to properly put up and operate the machinery, etc., and if the fact be traceable to not putting up and operating according to printed directions, purchaser agrees to pay all expenses incurred in rectifying it, thirty days' use of same will be conclusive evidence of fulfilment of warranty and acceptance. Of course, there was delay. Time had not been made of the essence of the contract. There was no delay for which plaintiffs were responsible under this contract. There would be delays in the running of the machinery with a line shaft of 180 revolutions. How could it be expected that it would properly run and be operated, when the gins were knowingly designed to be run by a line shaft making 250 revolutions per minute? This was a part of the contract, and defendant tried to make it work properly with a line shaft making 180 revolutions to the minute.

"The plaintiffs are not responsible for this action. It was sold to perform work of the capacity for which it was sold as per this order, which contemplates a line shaft making 250 revolutions per minute. This capacity was based on the use of such a line shaft making 250 revolutions per minute. Of

course, defendants wrote and complained tardily. There is no evidence that the gins should not have been operated efficiently if a line shaft making 250 revolutions per minute had been used instead of one making only 180 revolutions. There was some evidence or attempt to show the plaintiff did not promptly ship; it is to be remembered that the contract provides that the plaintiffs are not to be held responsible for any delays in shipping from any cause except its own employees' negligence. There was some effort to show some verbal statements of different persons about the testing of the machinery before shipping. Of what earthly use such a testing would be to the defendants, who did not expect to use the proper shaft in their use of it, but a different shaft from that with which it was tested, I cannot see. There was some testimony which sought to put a different contract in some respects from that entered into in writing, even if admissible, I do not think it shows any fraud or misrepresentation in its connection. Reference should be made to the provisions of the contract declaring that it is distinctly understood between us that no agreement, verbal or otherwise, will be recognized unless specified in this contract, which includes warranty on back hereof. I do not mean to be understood as saying that this provision would prevent the parties from making a subsequent contract, but no such contract has been proved here. I think the plaintiffs have shown that they are entitled to judgment. The matters set up by way of denial in the answer are not material. The contention is not sustained by the evidence. It is to be observed that the original agreement provided that certain notes should be given, which were not executed. I think they ought to have been executed. At first impression I was influenced by the non-execution in favor of a judgment requiring an order of enforcement. Upon maturer consideration, however, I am satisfied the judgment should be in money, as demanded in the complaint. The damages for non-execution should be really interest after all.

"I find, and it is so ordered and adjudged, that the plain-

tiff have judgment against the defendants for the sum of $1,444, with interest thereon from the first day of November, 1899, with ten per cent. additional on the whole amount due, as attorneys' fees, which I think reasonable under the circumstances, as provided for in contract.

"That said ginning outfit be sold, and all the property mentioned in the contract be sold, and the proceeds applied in payment of said debt, and should there be any balance left unpaid, that execution issue for said balance and for the costs, &c."

From this decree the defendants appeal.

*Mr. P. A. Emanuel,* for appellants, cites: *As to what makes up misrepresentation:* Pom. Eq. Jur., sec. 877. *What is fraud?* Pom. Eq. Jur., secs. 878, 879, 881, 882-884, 887, 897, 909; 125 U. S., 247; 92 Ind., 318. *Appellants are entitled to a rescission of the contract:* 36 S. C., 65; 37 S. C., 8; 4 DeS., 122. *Against what false representations one is entitled to relief:* 50 S. C., 401; 29 S. C., 282. *The contract is a chattel mortgage, and equity decree is not proper:* 40 S. C., 193; 29 S. C., 71; Jones on Chat. Mtg., sec. 749. *Measure of damages:* 25 S. C., 68; 27 S. C., 235; 57 S. C., 427.

*Messrs. G. W. Croft & Son,* contra, cite: *The written contract is the agreement between the parties, and other conditions could not be incorporated:* 24 S. C., 128; 1 Green. on Ev., sec. 277. *General exceptions not specifying errors will not be considered:* 26 S. C., 304; 42 S. C., 454.

February 18, 1902. The opinion of the Court was delivered by

MR. JUSTICE GARY. On the 23d of May, 1899, the Daniel Pratt Gin Co., of Prattsville, Ala., entered into a contract with the appellants, by which they were to deliver a gin system, consisting of gins, separators, distributors, suction pipes, fans, pipes for removal of seed, a press and many other parts therein set forth, among which was a line shaft

with a system of pulleys thereon—one of which in size had to be arranged with reference to the driving pulley on the engine, so that the driving pulley on the engine would operate on the driving pulley on the line shaft, and thereby give the other pulleys on the line shaft of the gin system the required speed, to wit: 250 revolutions per minute. The defendants were to furnish their own engine with their own driving pulley thereon, and to give the gin company the size of said pulley and the number of revolutions the engine caused it to make per minute, or, in other words, the speed of the engine with reference to the driving pulley on the engine so as to run the line shaft 250 revolutions per minute. Those provisions of the contract that are material to the questions under consideration are as follows:

"*Questions we must know.*—Whether there is an engine already up; if so, give the diameter and face of driving pulley, speed of same, also the position of said driving pulley as it sets in relation to the building; if not set up, whether there is any particular place same must be set. No particular place. Whether we furnish main driving pulley on line shaft. Yes * * * Date when shipped, August 3, 1899. I, or we, the purchasers, agree to furnish motive power to drive said machinery and to arrange to run the line shaft 250 revolutions per minute. Note—The pulleys listed in catalogue are based on line shaft running 250 revolutions; hence, *if there is any change in this speed, the pulleys which go on line shaft* will have to be changed accordingly * * * (italics ours).

"*Services of Man.*—It is hereby expressly understood that if the Daniel Pratt Co. are to furnish a competent man to superintend erection of above machinery, we agree to pay to and board their man while at work on the job, and also to place of erection of above machinery. We also agree to furnish all material for the erection of said machinery not stipulated in this contract, and to furnish said superintendent with all help necessary to erect the above mentioned machinery with dispatch. Which machinery we agree to

receive on arrival * * * The said Daniel Pratt Gin Co. is not to be held responsible for any delays in shipping from any cause except its own employees' negligence, and in no case shall damage for delay in shipping amount to more than the rental value of the property for the time of such delay * * * It is distinctly understood between us, that *no agreement,* verbal or *otherwise,* will be recognized unless specified in this contract, which includes warranty on back hereof. * * *

*"Warranty.*—The machinery is fully warranted to be of good material and well made, and with proper management to perform what is claimed for it in our printed circulars. But if, upon a full and fair trial, it should not satisfactorily do its work, then immediate notice must be given Daniel Pratt Gin Co., Prattsville, Alabama, and to the agent from whom it was purchased, and reasonable time allowed to send a competent man to remedy the defect; and in case the trouble be caused from a clearly defined original defect in the machine itself, then the Daniel Pratt Gin Co. will furnish the defective parts without charge; defect in any part not to condemn other parts. And if, on trial, the machine cannot be made to perform the work of a capacity for which it is sold, as per this order, then the Daniel Pratt Gin Co. agrees to take said defective machinery back, and refund so much of the cash payment and notes as applies to defective machinery. The purchaser agrees to properly put up and operate the machinery according to printed directions furnished by the manufacturers, and that if the fault be traceable to not putting up and operating according to printed directions, purchaser agrees to pay all expenses incurred in rectifying it. Thirty days' use of same will be conclusive evidence of fulfillment of warranty and acceptance. Any failure on the part of the purchaser to comply with his contract, releases this warranty entirely."

The other necessary facts are set forth in the decree of his Honor, the Circuit Judge, which will be reported. The defendants appealed from said decree on numerous exceptions.

We will first consider the fifth exception, which is as follows: "5th. That his Honor erred in his findings of facts in said decree in the following particulars, to wit: That the cause of the trouble with the machinery was the want of a proper size pulley on the main line shaft, and that the defendants were responsible for not having a proper size pulley thereon. He should have found that the Daniel Pratt Gin Co. were responsible, if the trouble arose therefrom, that their own experts were sent, at defendant's cost, to see that the machinery was arranged properly; and if such a pulley was needed, their own experts should have secured it and have placed it in position, and have demonstrated the machinery to be right before they turned it over to defendants; and that having failed to do so, they could not take advantage of their own wrong and failures to do the right and proper thing." His Honor, the Circuit Judge, says: "The principal cause of the defective working of the gins, it seems, was the defendants' action in attempting to run the machinery with a steam shaft making only 180 revolutions per minute, when the gins ordered were for steam shaft arranged to run the line shaft 250 revolutions per minute * * * Of course, the machinery worked badly—indeed, it would have been almost a miracle if it had worked smoothly under the conditions." At the time of the contract, the defendants did not have an engine, but contemplated purchasing an engine which they afterwards used, and this fact was made known to the agent of the gin company. After considerable correspondence between the parties to the contract, the gin company, on the 15th August, 1899, wrote the following letter:

"Messrs. J. E. & R. H. Timmerman, Timmerman, S. C.—Gentlemen: We are in receipt of yours of the 10th, in which you say the speed of your engine is 180 revolutions, besides the pulley on the line shaft is 2 1-2 ft., and the size pulley you want to go on the line shaft is to be 25 in. Taking your engine running at 180 revolutions with a 30 in. pulley on it, we have figured that it will be necessary for you to

have a pulley 21 in. in diameter to give our line shaft the proper speed, and have ordered this pulley shipped to you direct at Seigler Sta., S. C., so as to avoid delay, which we trust will be satisfactory. Yours truly, (Signed) Daniel Pratt Gin Co."

This pulley was received about the last of September, 1899. Previously and after that time the agent or superintendent of the gin company endeavored to put the machinery in good running order. Before receiving the pulley shipped by the gin company, the defendants used a pulley which they had borrowed from another party, but which likewise failed to give satisfaction. The following provision, to wit: "Note—The pulleys listed in catalogue are based on line shaft running 250 revolutions; hence, if there is any change in this speed, the pulleys which go on line shaft will have to be changed accordingly," is of vital importance in the construction of the contract. There was a change in the speed of the engine, of which the gin company was notified before it shipped the pulley, and its letter shows that the pulley was sold to be used on a line shaft making only 180 revolutions per minute. It was, therefore, the duty of the gin company, under its contract, to make the machinery "perform the work of a capacity for which it was sold," to wit: to do its work properly when run by a line shaft making 180 revolutions per minute. These views show that his Honor's construction of the contract was erroneous.

As this Court has determined to remand the case for a new trial, it deems it advisable not to consider the other exceptions, as they principally involve questions of fact, in order that the Circuit Court in trying the case, *de novo,* may not be trammeled by any conclusions of this Court except as to the construction of the contract—all other questions being left open.

It is the judgment of this Court, that the judgment of the Circuit Court be reversed, and the case remanded to that Court for a new trial.